Gary A. Nye, Esq. (Cal. Bar No. 126104)
David R. Ginsburg, Esq. (Cal. Bar No. 210900)
ROXBOROUGH, POMERANCE, NYE & ADREANI, LLP
5820 Canoga Avenue, Suite 250
Woodland Hills, California 91367
Telephone: (818) 992-9999
Facsimile:  (818) 992-9991
Email:       gan@rpnalaw.com; drg@rpnalaw.com

Attorneys for Plaintiffs Gonzales & Gonzales Bonds and Insurance Agency, Inc., Topper Brokerage, Inc., Allegheny Casualty Company, Lexington National Insurance Corporation, and American Surety Company

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GONZALES & GONZALES BONDS AND INSURANCE AGENCY, INC.; TOPPER BROKERAGE, INC.; ALLEGHENY CASUALTY COMPANY; LEXINGTON NATIONAL INSURANCE CORPORATION; and AMERICAN SURETY COMPANY,<br><br>            Plaintiffs,<br>vs.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY; CHAD F. WOLF, under the title of Acting Secretary of Homeland Security;  U.S. CITIZENSHIP & IMMIGRATION SERVICES; and KENNETH T. CUCCINELLI, under the title of Senior Official Performing the Duties of the Deputy Secretary of Homeland Security,<br><br>            Defendants. | Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**COMPLAINT**

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1. This case challenges a final rule that (1) mandates administrative exhaustion for a Treasury-approved surety or its agent to challenge the government's breach of an immigration bond without providing due process safeguards to allow for fair and impartial administrative review, (2) drastically increases the cost for administrative review, and (3) creates arbitrary criteria to determine whether a Treasury-approved surety can continue to post immigration bonds. 85 Fed. Reg. 45,968 (July 31, 2020) ("Final Rule").

2. The Final Rule requires that a Treasury-approved surety or its agent file an appeal of a bond breach claim by the government, and to include all defenses to the bond breach, without the government (1) producing documents supporting its breach determination, (2) producing documents to allow the surety and its agent to identify available defenses under the terms of the bond or mitigate damages claimed by DHS, and (3) allowing sufficient time for the surety or agent to discuss the circumstances of the bond breach with the alien or indemnitor.

3. This violates the due process rights of the sureties and their agents because any defense not raised in the administrative appeal is prohibited from being raised in subsequent litigation in federal court. Further, if the surety or its agent do not file an administrative appeal within 30 days of receiving of a breach notice, they are precluded from challenging the bond breach in federal court.

4. With administrative exhaustion now required, the Final Rule increases the cost for a Treasury-approved surety to dispute the government's breach of an immigration bond from $0 to $675, making it more expensive to challenge an immigration bond breach than it is to file a petition with the United States Supreme Court. With the penal amount of certain immigration bonds set at $500, it now costs more to dispute the breach of certain bonds than it does to pay the bond.

5. The Final Rule also creates such a low threshold for debarment of a surety that sureties will have no choice but to pay any breached immigration bond, even if the government is wrong in declaring the breach.

6. By making these changes, the Final Rule effectively deprives sureties and their

agents from challenging the government's breaches of immigration bonds.

7. The Final Rule also creates an unequal application of the law. A cash bond obligor is not required to exhaust his or her administrative remedies. Accordingly, their rights are reserved to challenge a bond breach in federal court based on any available defenses, regardless of whether the cash bond obligor filed an administrative appeal or not. In addition, and as noted above, the government does not provide any documents related to the bond breach determination prior to the time an appeal must be filed, and all defenses must be raised with the appeal or they are prohibited from being raised in a subsequent federal civil suit. The surety or its agent is therefore required to file an incomplete appeal, and is then precluded from raising any additional defenses in civil court if the appeal is denied and the breach determination upheld.

8. DHS is also applying the Final Rule retroactively in violation of Supreme Court precedent prohibiting retroactivity in the enforcement of regulations unless clearly prescribed.

9. The Final Rule is not authorized by statute, is contrary to law, and is arbitrary and capricious under the Administrative Procedure Act ("APA").

10. The Final Rule is also unlawful because it was issued under Chad Wolf, who assumed the title of Acting Secretary of the Department of Homeland Security without constitutional or statutory authority.

**JURISDICTION AND VENUE**

11. Defendants' promulgation of the Final Rule in the Federal Register on July 31, 2020 constitutes final agency action and is therefore subject to judicial review. 5 U.S.C. §§ 704, 706.

12. This Court has subject-matter jurisdiction under 5 U.S.C. § 702 and 28 U.S.C. § 1331.

13. Plaintiffs have standing to challenge the Final Rule under 5 U.S.C. § 702 because they have been and will be injured by the Final Rule's operation.

14. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e)(1) because immigration bonds affected by the Final Rule are posted in this judicial district.

**INTRADISTRICT ASSIGNMENT**

15. The San Francisco or Oakland divisions are the proper divisions for the assignment of this case because a substantial part of the events or omissions which give rise to the action occurred and occur in these divisions.

**PARTIES**

16. Plaintiff Gonzales & Gonzales Bonds and Insurance Agency, Inc. ("G&G") is a California corporation that is primarily engaged in the business of posting immigration bonds on behalf of federally approved surety companies with DHS for, among other things, the release of aliens from detention pending a determination of the alien's immigration status.

17. Plaintiff Topper Brokerage, Inc. ("Topper") is a New York corporation that is primarily engaged in the business of posting immigration bonds on behalf of federally approved surety companies with DHS for, among other things, the release of aliens from detention pending a determination of the alien's immigration status.

18. Plaintiff Allegheny Casualty Company ("Allegheny") is a New Jersey corporation and a federally approved surety company engaged in, among other things, the business of posting immigration bonds with DHS for, among other things, the release of aliens from detention pending a determination of the alien's immigration status.

19. Plaintiff Lexington National Insurance Corporation ("Lexington") is a Florida corporation and a federally approved surety company engaged in, among other things, the business of posting immigration bonds with DHS for, among other things, the release of aliens from detention pending a determination of the alien's immigration status.

20. Plaintiff American Surety Company ("American Surety") is an Indiana corporation and a federally approved surety company engaged in, among other things, the business of posting immigration bonds with DHS for, among other things, the release of aliens from detention pending a determination of the alien's immigration status.

21. G&G, Topper, Allegheny, Lexington, and American Surety are collectively referred to as "Plaintiffs."

22. Defendant U.S. Department of Homeland Security ("DHS") is a cabinet-level

1 | department of the United States federal government. DHS issued the Final Rule.

2 |     23.    Defendant Chad Wolf has held the title of Acting Secretary of Homeland Security since November 13, 2019. He is sued in that capacity, and the Final Rule was issued under his purported authority.

    24.    Defendant Kenneth Cuccinelli currently holds the role of Senior Official Performing the Duties of the Deputy Secretary of Homeland Security.

    25.    U.S. Immigration and Customs Enforcement ("ICE") is a sub-agency of DHS and is responsible for the administration of immigration bonds.

## THE FINAL RULE IS UNLAWFUL

### A.    The Administrative Review Process Is Fatally Flawed

    26.    The Final Rule requires administrative exhaustion through $675 appeals of immigration bond breaches to the Administrative Appeals Office ("AAO"). If a bond breach is not formally appealed to the AAO, the bond obligor and surety forfeit any challenge to the bond breach determination in federal court.

    27.    The AAO is not equipped to handle immigration bond breach appeals.

    28.    There is no appeal process other than the submission of an initial appeal through submission of a government form. While the surety or its agent may include arguments in support of their defenses with the appeal form, there is no briefing on the issues. Nor is there any exchange of documents, and DHS does not provide any documents to the surety or its agent related to the breach determination. There is no hearing. A DHS officer simply makes a decision based on review of the appeal form.

    29.    In addition, the AAO rarely issues precedential decisions, and none have addressed immigration bond breaches. Further, the AAO has not issued any precedential decisions adopting the legal findings of the court in *United States of America v. Gonzales & Gonzales Bonds and Insurance Agency, Inc., et al.* (Case No. C 09-4029 EMC). Those findings address the propriety of immigration bond breaches by DHS.

    30.    The AAO's standard of review is not codified in any statute or regulation.

    31.    The AAO does not state how it determines which cases become precedent

decisions. Nor does the AAO interact with local service centers and district offices to ensure that like cases are adjudicated in like manner.

32. The AAO has not published its appellate rules and statistics on decision making standards and data.

33. The vast majority of all immigration bond breach appeals to the AAO are denied.

34. Resorting to the AAO is futile, expensive, time-consuming, and without any due process safeguards. The substantial expenses, coupled with the futility of an AAO appeal, has resulted in many sureties choosing an informal written dispute methodology for challenging bond breaches, rather than pursuing relief through the AAO.

**B.** **Whether Through the AAO or a Written Dispute, DHS Refuses to Produce A-files for Bonds Where it Has Declared an Obligor or Surety to Be in Breach**

35. The A-file contains many documents that are relevant to disputed bond breach claims. These documents assist the surety in (1) identifying available defenses under the terms of the bond, (2) locating and producing the alien to DHS, and (3) mitigating damages claimed by DHS.

36. DHS produces little, if any, documents when declaring an immigration bond breach. DHS thereby prevents the sureties from being able to properly challenge DHS's bond breach declarations. The Final Rule authorizes DHS to continue this pattern of non-production while also demanding payment.

37. This violates a decision in *U.S. v. Gonzales & Gonzales Bonds and Ins. Agency, Inc.* (N.D. Cal., Sept. 25, 2012, No. C-09-4029 EMC). There, the court ordered DHS to apply certain standards for review of disputes over its bond breach determinations. DHS was ordered to produce the entirety of the A-files, and to "consider each defense for each bond and provide a decision for each bond breach determination, with an explanation of its reasons for accepting or rejecting each defense as to each bond found to be breached. Such reasoned decisions will permit this Court to correctly apply an arbitrary and capricious standard of review in keeping

with 8 C.F.R. § 103.6(e)."

38. DHS was further ordered to "evaluate these positions in a fair and neutral manner, upon the entirety of the administrative record before it. DHS shall then issue a reasoned decision and certify the administrative record, stating which parts of the record it believes deserves weight, and the reasons why." *U.S. v. Gonzales & Gonzales Bonds and Ins. Agency, Inc.* (N.D. Cal., Sept. 25, 2012, No. C-09-4029 EMC) 2012 WL 4462915, at 9.

39. None of these requirements are mentioned in the Final Rule.

40. The requirement that an immigration bond agent or surety pursue a $675 administrative appeal of an immigration bond breach declaration made by DHS fails to follow DHS's own procedure for reviewing disputes over its bond breach determinations. Reference in the Final Rule is made to both an appeal to the AAO or, alternatively, the submission of a written dispute to DHS. It remains unclear whether DHS is requiring an appeal to the AAO in order to seek judicial review, or whether a surety may also challenge a bond breach determination by written dispute. With the written dispute process still authorized in the Final Rule, it is inconsistent to require AAO exhaustion when this written dispute remedy exists to challenge a bond breach determination.

41. Further, for at least the past eight years, DHS has used a procedure whereby a bond agent or surety may submit a written dispute to DHS for review and a determination whether to uphold the breach or cancel the bond. While this process continues to have its flaws, it provides a better alternative to the AAO for review of disputed bond breach determinations.

42. It remains unclear how AAO review would function within this established written dispute process. The Final Rule requires an AAO appeal within 30 days of a breach determination, but a surety is already permitted 30 days to submit a written dispute. If it chooses to submit a written dispute, it will effectively be time-barred from submitting an appeal to the AAO.

43. The 30-day deadline for appealing to the AAO also fails to allow enough time for a surety to discuss the circumstances of a bond breach with the alien or indemnitor. DHS only sends a notice of a bond breach. DHS does not send any documents supporting the breach

determination. It takes at least an additional 60 days for a surety or its agent to receive a "Record of Proceedings" from DHS. The Record of Proceedings is what DHS claims are the documents relevant to support its breach determination. By the time the surety or its agent receives these documents, they were already required to file an appeal of the breach determination and raise all their defenses.

44. In addition, the Record of Proceedings is insufficient and does not include all documents necessary for a surety or its agent to prepare and file their appeal. It only includes a limited number of documents selected by DHS that only purport to support DHS's bond breach claim.

45. Sureties or their agents are not provided the A-File, which is required by court decisions addressing immigration bond breach appeals. And documents requested through a Freedom of Information Act ("FOIA") request and that are related to the bond breach determination take even longer to be produced. Yet, the Final Rule requires the surety or its agent to have already appealed the breach decision and raised all arguments in support of its position within 30 days of receipt of the breach notice. This time constraint makes it impossible to prepare a proper and timely appeal.

46. In contrast, those who post cash immigration bonds are not required to exhaust administrative remedies through an appeal to the AAO. If an individual posts a cash bond, he or she may challenge DHS's breach determination in federal court without the requirement of filing an AAO appeal.

47. DHS is also applying the Final Rule retroactively in violation of U.S. Supreme Court precedent. In *Bowen v. Georgetown Univ. Hosp.*, *supra*, 488 U.S. 204, 208, the Court held that "[r]etroactivity is not favored in the law ... [and] congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result." A law or regulation operates retroactively if it "impair[s] rights a party possessed when he acted, increase[s] a party's liability for past conduct, or impose[s] new duties with respect to transactions already completed." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994).

48.     DHS is applying the requirement of an AAO appeal to bonds posted prior to adoption of the Final Rule. The sureties and their agents entered into contracts with aliens and indemnitors based on the mutual understanding and agreement between all the parties, including DHS, that there was no requirement of administrative exhaustion to challenge a bond breach. DHS has now altered this understanding and effectively changed the terms of the posted bonds to implement this requirement. As such, the Final Rule is unlawful as it is being applied retroactively.

### C.     No Statute Authorizes DHS to Decertify Sureties

49.     Congress has not delegated to the DHS the authority to establish its own standards for the declination of a surety's bonds.

50.     The Final Rule conflicts with 31 U.S.C. §§ 9304-9308 and impermissibly alters these code sections without Congressional approval or authority. It allows DHS to usurp the authority of the Treasury as the sole Government agency authorized by Congress to approve and revoke the authority of a surety to provide surety bonds.

51.     The Final Rule allows DHS to decline to accept any and all bonds underwritten by a Treasury-certified surety whenever DHS claims (1) ten or more invoices issued to the surety on "administratively final breach determinations" are "past due", or (2) the surety "owes" a cumulative total of $50,000 or more on "past due" invoices issued to the surety on "administratively final breach determinations,"[1] or (3) the surety has a "breach" rate of 35 percent or greater based on a comparison of "administratively final breach determinations" and bond cancellations.

52.     No code section authorizes such arbitrary power. The only code section that addresses the ability of a surety to do business is 31 U.S.C. 9305, and that section clearly and unambiguously provides that only Treasury may revoke the authority of a surety corporation to do new business, and it may do so only if (1) the Secretary decides the corporation is insolvent,

---

[1] With the increasingly high penal sum of bonds being written, this cumulative maximum could very well involve one disputed bond breach determination.

or (2) is in violation of sections 9304, 9305 or 9306. None of these three sections authorize revocation if there is an outstanding unpaid bond obligation. Nor are these regulatory "changes," as claimed by DHS. Rather, they are entirely new regulations. And there is no reference in these regulations to any recently passed legislation authorizing them.

53. These regulations effectively grant DHS the authority to revoke a surety's certification by bypassing the one and only statutory scheme governing revocation of a surety's certification.

### D. Only Treasury Has Limited Authority to Prevent a Surety from Conducting Business

54. By providing agencies such as DHS with the authority to refuse bonds from certain sureties, the Final Rule conflicts with 31 U.S.C. 9304-9308, which specifically authorize Treasury to certify and decertify sureties posting federal bonds. The "background" section of the Final Rule confirms that Treasury is responsible for administering the corporate Federal surety bond program under the authority of 31 U.S.C. §§ 9304-9308. Treasury does not have the right to delegate, by regulation or otherwise, its exclusive authority to administer federal surety bonds.

55. 31 U.S.C. 9305 clearly and unambiguously provides that Treasury may revoke the authority of a surety corporation to do new business only if (1) the Secretary decides the corporation is insolvent, or (2) is in violation of sections 9304, 9305 or 9306. None of these three sections authorize DHS to reject a bond issued by a surety who has an outstanding unpaid bond obligation that DHS contends is due and owing.

56. 31 U.S.C. 9305(e) precludes the writing of an additional bond only if the surety has not paid a final judgment that has not been appealed. The Final Rules allows DHS to replace this "final judgment" provision of 31 U.S.C. 9305(e) with DHS's claim that there are "past due" invoices on "administratively final breach determinations." A final judgment is no longer required even though Congress specified this requirement. DHS's utilization of a standard that is far more stringent than the standard Congress has provided to Treasury violates due process and runs afoul of specific Congressional intent on the subject.

57. There is no authority for these changes to the code section. The regulations impermissibly alter statutory mandates and create new law by allowing DHS to administer the Federal surety bond program. The U.S. Supreme Court has rejected such regulations. In *Bowen v. Georgetown University Hosp.*, 488 U.S. 204, 208 (1988), the Court held that it is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress.

58. In *Manhattan General Equipment Co. v. Commissioner of Internal Revenue*, 297 U.S. 129, 134-135 (1936), emphasis added, the Court held that:

> "[t]he power of an administrative officer or board to administer a federal statute and to prescribe rules and regulations to that end is not the power to make law, for no such power can be delegated by Congress, but the power to adopt regulations to carry into effect the will of Congress *as expressed by the statute*. A regulation which does not do this, but operates to create a rule out of harmony with the statute, is a mere nullity . . . And not only must a regulation, in order to be valid, be consistent with the statute, but it must be reasonable."

59. Further, where a Treasury statute is unambiguous, and its directions specific, there is no power to amend it by regulation. *Koshland v. Helvering*, 298 U.S. 441, 446-447, 56 S.Ct. 767, 769 - 770 (1936). *See also Goodson-Todman Enterprises, Ltd. v. Commissioner,* 784 F.2d 66, 74 (2d Cir.1986) ("A Treasury regulation may therefore be declared invalid . . . if it is unreasonable or clearly contrary to the language or spirit of the statute it purports to implement").

60. Congress delegated to Treasury (rather than DHS) the sole authority to decertify sureties because Treasury has expertise in financial matters and the financial surveillance of sureties authorized to write federal bonds. DHS does not have the expertise to conduct due process hearings regarding the value of a security, and more importantly, DHS has a conflict of interest in conducting such proceedings because its goal in refusing to accept immigration bonds is to force the surety to pay invoiced bonds, even though the underlying breaches may be

disputed. This creates an incentive for DHS, whose AAO unit is ostensibly reviewing bond breaches impartially, to uphold its breaches.

61. The current federal statutes provide a vehicle to address a recalcitrant surety. Treasury has hearings providing substantial rights to the surety to contest the allegations of a disgruntled agency.

### E. The Regulations Alter the Existing Standard of Review in Decertification Proceedings

62. The regulations allow DHS to refuse all immigration bonds by a surety if DHS determines that "administratively final breach determinations" are "past due." This is no different than decertification. Such a harsh, drastic decision is limited, and only permitted under 31 U.S.C. 9305(e)(1), which precludes the writing of an additional bond only if the surety has not paid a *final judgment that has not been appealed*.

63. The Final Rule would result in unprecedented deference to DHS to make the law, to produce only those records it deems necessary to produce (even if the records in DHS's possession would refute DHS's claim on the bond), and to adopt without challenge only those interpretations most advantageous to the agency.

64. DHS's interpretation of the law is not the law. The law and the interpretation of statutes are decided by the courts, not by a governmental agency attempting to collect debt to pay for its programs. Many of the issues that the sureties rely upon in refusing payment have been adjudicated against DHS. To allow DHS to refuse bonds, i.e. decertify a company, based on erroneous interpretations of law that are subject to judicial challenge is a deprivation of due process.

### F. The For Cause Standards are Flawed and Anticompetitive

65. DHS identifies three metrics that it will use to determine whether it will continue to accept immigration bonds from a surety. If the surety does not meet any one of these "standards", DHS can decline all future immigration bonds from that surety. These "for cause" measurements are arbitrary, fail to reflect a surety's performance in paying legally valid bond breach determinations, and penalize sureties and their agents in favor of cash bond obligors.

66. First, DHS treats a single, $50,000 immigration bond invoice the same as ten invoices which may total far less than $50,000. Treating a single bond breach as equivalent to ten bond breaches is arbitrary and makes little sense. There must be consistency in any standard used by the government to determine whether it will prevent a surety from conducting business.

67. Another "for cause" standard uses a breach rate calculation. DHS proposes to take the number of bond breaches from October 1 to September 30 of the preceding year and divide that by the number of bond breaches and number of cancelled bonds during that same year. This is flawed and unfair for several reasons. DHS makes clear in its preamble to the Final Rule that it has had a problem with the failure to pay breaches by sureties and their agents. This is the sole purpose identified by DHS for the Final Rule. By trying to monitor performance of a surety, the 35% breach rate calculation as a "for cause" reason to refuse certain bonds is not in furtherance of DHS's stated purpose in enacting the Final Rule.

68. It is also arbitrary to set a snapshot time frame to make a breach rate calculation. A surety may have several cancellations a few days or weeks before the start of a fiscal year or shortly after the fiscal year concludes. A surety could be slightly over the 35% threshold during one fiscal year, and under it the previous and subsequent fiscal years. Being above or below the 35% number could thus become a function of luck more than anything else. Further, by creating calculation periods, a surety or agent would be incentivized to seek cancellations or challenge breaches, and time them so that a breach or cancellation would fall prior to or after a fiscal year begins.

69. Moreover, DHS's failure to include all outstanding bonds issued by the surety in determining a breach rate calculation is unfair. A surety can have 5 breaches and 8 cancellations during a fiscal year, for a 38% "breach rate." But it may have an additional 87 bonds outstanding during that fiscal year. The number of breaches in comparison to the number of outstanding bonds plus cancelled bonds would be 5%. Rather than use this number to calculate a breach rate, DHS ignores bonds that have not been breached or cancelled. Those bonds can most certainly end up being cancelled as the years proceed, thereby substantially lowering the breach rate that was calculated as of a certain date based on a very small statistical

sampling. But that would count for nothing during that particular breach rate calculation. DHS instead will extrapolate a breach rate by arguing that the breach rate will remain consistent as the outstanding bonds are either breached or cancelled over a very long period of time. There is no basis for such a methodology, no statistical analysis for calculating a breach rate in this fashion, and DHS offers no explanation in support of its arbitrary standard. In short, DHS relies on speculation of future breaches and cancellations to justify its refusal to allow the posting of bonds from a surety. This is another example of a due process violation. Under DHS's standard, there would be nothing to challenge before DHS simply refused to accept any further immigration bonds from a Treasury approved surety company. DHS seeks to deny the ability of a surety or agent to post a bond by using an untested and unapproved extrapolation model.

70. The "for cause" standards are also anticompetitive. They create unfair measurements for surety bonds, while failing to impose the same standards for cash bonds. The government contends that it can simply take the cash posted for a cash bond and therefore does not need to set any requirements for cash bond obligors. But this is a tacit acknowledgement that DHS has no problem with bond breaches, as long as they are paid. Yet, DHS's breach rate calculation punishes surety bond obligors by counting paid bond breaches against them. Payment by cash bond obligors has absolved them of any repercussions as they are not subject to the Final Rule. On the other hand, payment by surety bond obligors does not absolve them from being punished as paid bond breaches will count against them. This favors cash bond obligors and, in turn, manipulates the immigration bond market by punishing all surety bond companies and their agents, regardless of whether they pay breaches or not.

71. As with other attempts to manipulate a market arbitrarily and without sufficient research, there will be unintended consequences. It will become more difficult for those seeking release from DHS detention pending review of their immigration status to be released. Surety bonds will become less available and fewer individuals will be released as cash bonds will not be affordable to many. Detention will increase, costing the government even more money to fund and administer newly needed detention space.

72. The Final Rule is irrational, arbitrary, contrary to law, and an unjustified reversal

of past practice. It must be set aside under the APA. See 5 U.S.C. § 706(2)(A), (C), (D) (rules issued "without observance of procedure required by law," "not in accordance with law," or "in excess of statutory authority" must be set aside).

### G. DHS's Review Has Proven Futile

73. The Final Rule authorizes DHS to administer the Federal surety bond program even though DHS has been found in court decisions to not abide by its agreements and established law regarding immigration bonds and breach determinations. DHS's "administratively final" determinations that an immigration bond has been breached have been made in error, as determined by the federal court in *United States of America v. Gonzales & Gonzales Bonds and Insurance Agency, Inc., et al.* (Case No. C 09-4029 EMC).

74. In *United States of America v. Gonzales & Gonzales Bonds and Insurance Agency, Inc., et al.* (Case No. C 09-4029 EMC), the court ruled that the obligations set forth in statutes, regulations, case law, and the terms specified in the immigration bonds themselves must all be considered when the agency declares a bond breach. The court also held that a surety is entitled to review of the entire A-file, with the exception of privileged documents, to determine if DHS's administratively final breach declaration is proper. This exacting judicial review is a far cry from the Final Rule, which simply allow DHS to reject sureties and seek their decertification by claiming that it has declared an immigration bond breach to be administratively final.

75. In *Gonzales & Gonzales*, the surety initially asserted 17 bonds in a counterclaim where it claimed that DHS's administratively final breach determination was in error. DHS then sought to remand 11 of the 17 bonds where it too felt its initial breach determination was in error. That amounts to an admitted 65% error rate by DHS. If the Final Rule had been in effect at that time, DHS could have simply declared that 11 bonds were due and owing from the surety, and it would therefore no longer allow immigration bonds to be posted by that surety.

76. As the case proceeded, the court ruled that DHS abused its discretion in making bond breach determinations in a majority of bonds presented for summary judgment by the parties. The rulings were then applied to all the disputed immigration bond breach

determinations made by DHS on bonds posted by the surety. The result was that hundreds of bonds DHS declared as breached and "past due" were erroneously declared breached and were not, therefore, past due.

77. The Final Rule eviscerates this necessary judicial review and allows DHS to threaten to cut off their business unless sureties pay up, regardless of whether DHS is wrong on the law.

## COUNT I

### (Violation of Administrative Procedure Act, 5 U.S.C. § 706)

78. Plaintiffs reallege and incorporate by reference all preceding paragraphs.

79. Under the APA, a court must set "aside agency action" that is "not in accordance with law." 5 U.S.C. § 706(2)(A).

80. The APA states that a court must "hold unlawful and set aside" agency action that is "arbitrary, capricious, [or] an abuse of discretion, or otherwise not in accordance with law; … (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;… (D) without observance of procedure required by law …" or "(E) unsupported by substantial evidence." 5 U.S.C. § 706(2). Courts will invalidate agency determinations that fail to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted).

81. Furthermore, when an agency substantially alters a position, it must "supply a reasoned analysis for the change," *State Farm*, 463 U.S. at 42, and may not "depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 515 (2009) (citing *United States v. Nixon*, 418 U.S. 683, 696 (1974)).

82. The Final Rule is unlawful under the APA for several independent reasons mentioned above, each of which is sufficient to require that the Final Rule be set aside.

///

///

## COUNT II

**(Violation of the Fifth Amendment – Equal Protection, U.S. Const. amend. V)**

83. Plaintiffs reallege and incorporate by reference all preceding paragraphs.

84. The Due Process Clause of the Fifth Amendment prohibits Defendants from denying any person the equal protection of the laws.

85. The Final Rule favors cash bond obligors over Treasury-approved sureties who post immigration bonds. It creates a dual legal system whereby cash bond obligors need not exhaust administrative remedies while reserving their rights to challenge a bond breach in federal court. On the other hand, in order to reserve their rights to challenge a bond breach in federal court, sureties must quickly appeal a bond breach and pursue administrative relief without being provided necessary due process safeguards

86. On this basis, DHS has violated the equal protection guarantee of the Fifth Amendment's Due Process Clause.

## COUNT III

**(Violation of Administrative Procedure Act, 5 U.S.C. § 706)**

87. Plaintiffs reallege and incorporate by reference all preceding paragraphs.

88. Under the APA, a court must set "aside agency action" that is "not in accordance with law." 5 U.S.C. § 706(2)(A).

89. The issuance of the Final Rule was an agency action.

90. The Secretary of Homeland Security is a principal officer of the United States whose appointment requires presidential nomination and Senate confirmation. 6 U.S.C. § 112(a)(1).

91. Defendant Wolf issued the Final Rule purportedly in the performance of the function or duty of Acting Secretary. Defendant Wolf was not validly appointed and lacked authority to issue the Final Rule.

92. The Final Rule should be set aside under the APA for contravening the APA.

///

///

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court:

1. Declare that the actions of the Defendants are arbitrary, capricious, and otherwise not in accordance with the law and without observance of procedure required by law in violation of the Administrative Procedure Act, 5 U.S.C. § 706.

2. Declare that the actions of the Defendants violate the equal protection guarantee of the Fifth Amendment's Due Process Clause.

3. Enter a preliminary and permanent nationwide injunction, without bond, enjoining Defendants, their officials, agents, employees, and assigns from implementing or enforcing the Final Rule.

4. Stay the implementation or enforcement of the Final Rule.

5. Award Plaintiffs their reasonable attorney fees and litigation costs in this action pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 *et seq.*, and all other applicable authorities; and

6. Order such other relief as the Court deems just and equitable.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a jury trial.

Respectfully submitted,

Dated: December 14, 2020

ROXBOROUGH, POMERANCE, NYE & ADREANI, LLP

By:    s/ Gary A. Nye
Gary A. Nye
David R. Ginsburg

Attorneys for Plaintiffs Gonzales & Gonzales Bonds and Insurance Agency, Inc., Topper Brokerage, Inc., Allegheny Casualty Company, Lexington National Insurance Corporation, and American Surety Company